### HATCHER *v.* THE STATE.

1. The circumstances of the homicide, as testified to by some of the witnesses, authorized the trial judge to instruct the jury as to the law of voluntary manslaughter, in addition to that of murder and justifiable homicide. The verdict for voluntary manslaughter was supported by the evidence.

2. In the absence of a request so to do, the trial judge committed no error in failing to instruct the jury on the law as to the impeachment of witnesses ; nor did he commit any error in overruling the motion for a new trial on the ground of newly discovered evidence.

Argued November 17, — Decided December 10, 1902.

Indictment for murder.    Before Judge Littlejohn.    Dooly superior court.    October 7, 1902.

*John F. Powell & Son,* for plaintiff in error.
*F. A. Hooper, solicitor-general,* contra.

LITTLE, J. Hatcher, the plaintiff in error, was indicted for murder, and it was charged that with malice he unlawfully killed one Will Harrold by shooting him with a gun. The trial resulted in

a verdict finding the accused guilty of voluntary manslaughter. He submitted a motion for a new trial, which being overruled, he excepted. The grounds of the motion allege that the verdict is contrary to the evidence ; that the trial judge erred in charging the law of voluntary manslaughter, because the same was unauthorized by the evidence; and that the judge also erred in failing to charge the law in relation to the impeachment of witnesses ; and there was a ground of newly discovered evidence. The first two of these grounds may be considered together ; for if the evidence did authorize the verdict for voluntary manslaughter, a charge on the law relating to that offense was proper. We have given the brief of evidence a careful examination, and find that there is very little difference in the evidence of the witnesses introduced by the State and those who testified in behalf of the defendant. It appears from the testimony of some of the witnesses that the deceased with other persons was engaged in gaming in the open air near to a house where quite a number of persons had congregated at an entertainment; that a misunderstanding arose between the deceased and a third person in relation to a sale of whisky ; that the proprietor of the house sent the accused to where the persons were so engaged, with the request to stop the fuss ; that the deceased was quarrelsome, and defied the accused to stop it, and went to the house where the entertainment was and got his gun. It also appears that the accused followed the deceased, and also got a gun; that they came near together after leaving the house, when the deceased cocked his gun and, pointing it at the accused, proposed, as both had guns, that they "die and go to hell together." The accused requested the deceased to take his gun " off of him." Not having done so, he requested him again to take his gun out of his face. This request not being complied with, he asked him a third time to do so, which not being done, he then shot and killed him.

Some of the witnesses testified also that just before the deceased was shot he made a step towards the accused. All of them agree that the parties were within a few steps of each other; that the deceased held his gun, which was cocked, pointing directly towards the accused, and that no reason existed why he could not have shot him. One of the witnesses for the State gives substantially the following account of the shooting and what happened immediately before. Referring to the time when the deceased and the

accused had left the house, he says: "They were both going in the direction of the crowd. . . I know that Will Hatcher spoke to Will Harrold and told him to go on and shoot him, because I heard him. He didn't call Will Harrold's name, but when he spoke Will Harrold turned around. Will Harrold had his gun, . . not exactly under his arm. . . He took it close up under his arm, . . [and] threw his gun on him just a little after that. He looked around before he turned, and . . he seed Will Hatcher with the gun, and at that time he whirled his body around. He turned around bringing his gun up, was bringing it around when he was turning, and when he got turned around he had his gun in his face. . . Will Harrold cocked his gun as he whirled around. . . Hatcher asked Will Harrold three times to take his gun out of his face. He didn't ask him one time right after the other. He asked him about two or three minutes apart. When he asked him the third time there was no motion made by Will Harrold, not a bit. Will Harrold kept his gun in Will Hatcher's face. When Will Hatcher asked him for the third time to take the gun out of his face Will Hatcher didn't have his gun on him. . . He never did bring the barrel in position to shoot him until he got ready to shoot him. He would carry his gun up . . and bring it down; brought it down three times; as he brought it down the third time he dropped it in his hand . . and shot him. There was no motion made by Will Harrold at that time." One of the witnesses for the defense testified, to the manner in which deceased was shot, as follows: "Harrold had every opportunity to shoot him. All he had to do was to pull the trigger."

1. The theory of the State was that the accused was guilty of murder, because he did not shoot the deceased under the fears of a reasonable man to prevent the deceased from committing a felony on his person. The theory of the defense was that the accused in shooting the deceased acted in self-defense. These two theories were fairly given in charge to the jury in connection with the law relating to voluntary manslaughter. The jury did not take the view that the accused shot in self-defense, and the circumstances of the shooting, in our opinion, did not require such a finding. From the evidence of witnesses for the State it would appear that the accused shot the deceased more because he would not cease pointing his gun at him, than because he feared that it was the purpose

of the deceased to fire on him. Had the accused instantly fired when deceased pointed his gun at him, that circumstance would have indicated that the shooting was done to protect himself; but if the evidence of these witnesses be true, he first told the deceased, deliberately, to take his gun off of him; the deceased failing to comply, he told him a second time, in the same manner, to take his gun off of him, and repeated it a third time, and, not being obeyed, shot. Neither the witnesses for the State nor those for the accused saw any reason why the deceased could not have shot the accused had he desired to do so; and while they differ as to the actions of the deceased at the time he was shot, the jury could very properly have found that the accused did not shoot to prevent the commission of a felony on his person, and therefore that the homicide was not justifiable. On the other hand, the jury did not adopt the theory of the State that the accused, in shooting the deceased, acted from malice. And there were circumstances which justified them in arriving at this conclusion; for the deceased armed himself with a loaded gun, placed it in a position ready for firing, and pointed it directly at the accused within range. This was an assault upon him, and although the deceased made no active effort to shoot, yet if the accused shot because of this assault, the jury were authorized to grade the homicide as voluntary manslaughter. It is said, however, that the shooting was not the result of passion. The jury may properly so have found. The evidence is, that, while directing the deceased to withdraw his gun, the accused repeatedly raised and lowered his own gun in a particular manner. In any event it was such an assault on the accused as justified the excitement of passion, and if the accused shot because of this assault upon him, and not to prevent a felony, the offense was voluntary manslaughter. This theory of the homicide is easily supported by the evidence. The jury found it to be true, and the trial judge committed no error in giving the law relating to this offense in charge to the jury.

2. As to the proposition that the trial judge committed error in failing to instruct the jury on the law as to the impeachment of witnesses, when there was no request made for such instruction, it is sufficient to say that this court has more than once ruled that such a failure, in the absence of a request, is not error. See *Smith* v. *Page*, 72 *Ga.* 539 ; *Stevens* v. *Railroad Co.*, 80 *Ga.* 19 ; *Cole* v. *Byrd*, 83 *Ga.* 207 ; *Lewis* v. *State*, 91 *Ga.* 168 ; *Joiner* v. *State*, 105 *Ga.* 646.

It must also be ruled that the court committed no error in over-ruling the motion for a new trial because of the newly discovered evidence set out in the record. This consisted of an affidavit of a person who apparently was not sworn on the trial, to the effect that prior to the homicide he heard the deceased make threats against the accused, which the witness communicated to the accused. Proof of threats of the kind indicated in the affidavit, had they been in the evidence before the jury, would in all probability not have had any effect on their finding, because that finding was apparently based on the actions of the parties at the time of the homicide. But aside from this, the rule in relation to the grant of a new trial on the ground of newly discovered evidence, as laid down in the Civil Code, § 5481, is, that if the newly discovered evidence is that of witnesses, affidavits as to their residence, associates, means of knowledge, character and credibility must be adduced. No affidavit in relation to either of these subjects is found in the record. So, even if the evidence alleged to be newly discovered was sufficient to authorize the grant of a new trial, an observance of the rule just stated would prevent that result from being reached in the present case.

*Judgment affirmed. All the Justices concurring, except Lumpkin, P. J., absent.*